## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Kevin O'Dowd, being first duly sworn, hereby depose and state as follows:

### Introduction and Agent Background

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of a cellular phone—described below and with particularity in Attachment A—that is currently in the possession of the United States Border Patrol (USBP) and the seizure from that device of the electronically stored information described in Attachment B. The applied-for warrant would authorize the forensic examination of the Subject Electronics for evidence of alien smuggling in violation of 8 U.S.C. §§ 1324 and 1325 (including conspiracy to commit offenses under that section).

2. I am a Border Patrol Agent (BPA) of the USBP, a component of Customs and Border Protection (CBP) within the Department of Homeland Security (DHS). I have been so employed since July 17, 2006. I am currently assigned to the Richford, Vermont station as a Border Patrol Agent (Intelligence) (BPA(I)). I have been assigned to the Richford Station as a BPA(I) for approximately 11 months. I was previously assigned to the Sierra Blanca, Texas Border Patrol Station as a BPA for approximately 6 years, and to the Special Operations Group Headquarters in El Paso, Texas as a Border Patrol Search Trauma and Rescue Operator for approximately 8 years.

3. As part of my present duties, I investigate criminal violations of the Immigration and Nationality Act as codified in Title 8 of the United States Code, as well as violations of other federal criminal codes. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C). I received formal training to identify and investigate alien- and drug-smuggling activities both at the USBP Academy and through regular and

1

recurring on-the-job training and annual Performance and Learning Management System course certification. In my experience, and the experience of agents with whom I have consulted, electronic devices are commonly used in several cases to facilitate smuggling events by coordinating transportation and drop-off / pick-up locations via global positioning system applications and verbal and/or non-verbal communications relayed over Wi-Fi and/or a telecommunications network.

4. The information in this affidavit comes from my personal observations and investigation, my training and experience, reports made available to me by other law enforcement authorities, analysis of documents and DHS records, and my discussions with other law enforcement officers who have direct knowledge of the events described below. As a result of my participation and review of past and present reports made by agents of the USBP, I am fully familiar with the facts and circumstances of this investigation. This affidavit is intended to show only that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Unless otherwise noted, descriptions in this affidavit of statements made by witnesses or during interviews are related here in part, sum, and substance and are not direct or full quotations.

5. The property to be searched is a Samsung S8 smartphone owned by and seized from Roberto CHUMIL-Hernandez on or about September 25, 2021, that is currently in storage at the USBP Sector Intelligence Unit in Swanton, Vermont (CHUMIL's PHONE). Through my training and experience, I know that CHUMIL's PHONE has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when CHUMIL's PHONE first came into the possession of the United States Border Patrol. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of

Title 8, United States Code, Section 1324 have been committed by Roberto CHUMIL-Hernandez and others and that evidence of those violations would likely be found on CHUMIL's PHONE.

**Probable Cause**

6. On Saturday September 25, 2021, at approximately 7:00 pm Eastern, Border Patrol Agents at the Richford, Vermont Border Patrol Station were notified by Swanton Sector Communications (KAK640) that several people were captured in an image take by a remotely operated camera placed in a wooded area directly adjacent to the international border between Canada and the United States in the Richford Area of Responsibility (AOR). The camera is activated by motion within its field of view; it automatically records images when motion is detected and transmits them to USBP computer systems where they can be viewed by USBP personnel. USBP agents place cameras such as this one in areas known to have been used by smugglers or undocumented aliens attempting to cross the border without inspection by immigration officers.

7. The camera that activated on September 25, 2021, was located approximately 0.4 miles east of the West Berkshire, Vermont Port of Entry (POE). The West Berkshire POE is at the northern terminus of Vermont Route 108, in a sparsely populated rural area in western Vermont within the Richford AOR. Richford USBP agents were aware that the area has been frequently used by alien smugglers periodically in the preceding year and that several of those events had taken place during the evening hours on Saturdays. Agents were also aware that drivers participating in those smuggling events would often pick up or attempt to pick up the aliens who had entered the United States illegally along the side of Route 108.

8. After being notified of the camera activation, BPA Bruce Vogt positioned himself on the west side of Route 108—approximately 0.5 miles south of the international border and

approximately 0.75 miles north of Route 120—to observe any vehicles that might attempt to pick up the suspected aliens depicted in the remote camera images. That portion of Route 108 serves only a few farms and the West Berkshire POE, which was closed at this time of night; accordingly, vehicle traffic in the area is normally sparse during evening hours and generally consists only of local traffic. At approximately 10:30 pm, BPA Vogt observed a sport utility vehicle (SUV) travel north past his location. Approximately 3 minutes later, the same SUV passed BPA Vogt again, now traveling south. BPA Vogt observed that the SUV was traveling at low speeds, and it began flashing its turn signals on and off in a location where there were no roads for it to turn onto. BPA Vogt knew from his experience in the USBP that transporters working with alien smugglers will often flash their vehicle's lights to signal the aliens to come out of hiding to be picked up and transported further into the country.

9. BPA Vogt observed the SUV come to a complete stop, and several people emerged from a ditch along the road and entered the vehicle. The SUV then resumed traveling south on Route 108. BPA Vogt notified other agents in the area via radio that the SUV had likely picked up aliens and that it was traveling south toward the intersection of Route 108 and Route 120.

10. Supervisory Border Patrol Agent (SBPA) Troy Edwards was positioned nearby, and he began following the vehicle in his marked USBP truck. SBPA Edwards requested records checks on the vehicle's license plate through dispatch, and he received a response indicating the vehicle was registered to EAN Holdings Inc., a car-rental business. SBPA Edwards knew from his experience that alien smugglers will often use rental vehicles to transport aliens from the border area to their next destination within the United States. SBPA Edwards activated his emergency lights to initiate a vehicle stop and conduct an immigration inspection of the SUV's occupants. The SUV pulled over near the intersection of Route 108 and Route 120. BPA Vogt

4

arrived on scene to assist SBPA Edwards as the SUV came to a stop.

11. BPA Vogt approached the passenger-side front window while SBPA Edwards approached the driver's window. Agents observed the SUV, a silver Toyota RAV4, was occupied by six people: one in the driver's seat, one in the front passenger seat, and four in the rear seat. SBPA Edwards instructed the driver exit the vehicle and stand near the rear of the vehicle, and BPA Vogt instructed the front seat passenger to exit the vehicle and sit down near the rear of the vehicle.

12. BPA Vogt identified himself as a U.S. Border Patrol Agent and asked the front seat passenger if he spoke English. The passenger responded, "No." BPA Vogt then switched to the Spanish language, in which the passenger was able to communicate. BPA Vogt asked the passenger to state his citizenship, and he responded "Guatemala." BPA Vogt asked the passenger if he had just entered the U.S., and he responded "No." BPA Vogt asked the passenger when he last entered the U.S., and he responded, "2011." BPA Vogt asked the passenger if had any documents to be in the U.S. legally, and he responded "No." BPA Vogt asked the passenger where he lived, and he responded "Washington" and produced a Washington D.C. driver's license identifying him as Roberto CHUMIL-Hernandez. BPA Vogt then arrested CHUMIL for being present in the U.S. without admission by an immigration officer and placed him in a USBP vehicle for transport to the Richford Border Patrol Station.

13. SBPA Edwards spoke with the driver, who produced a Washington D.C. driver's license identifying him as Francisco Antonio HERNANDEZ-Molina. HERNANDEZ stated he was a citizen of El Salvador, and he was unable to produce any valid immigration documents allowing him to enter, remain in, or travel through the U.S. legally. SBPA Edwards then arrested HERNANDEZ for being present in the U.S. without admission by an immigration officer and

placed him in a separate USBP vehicle for transport to the Richford Border Patrol Station.

14. Agents questioned the rear seat occupants as to their citizenship, and all four stated they were citizens of Guatemala. The subjects presented Guatemalan national identification documents identifying them as Matias Briseyda CASTILLO-Ramirez, Cindy PEREZ-Pinzon, Leonel PINZON-Revolorio, and Abelardo Eulalio ROBLERO-Galvez. Each of the rear seat passengers freely admitted to being in the United States illegally, having just entered without inspection. CASTILLO, PEREZ, PINZON, and ROBLERO were placed under arrest for being present in the U.S. without admission. They were then transported to the Richford Border Patrol Station for further investigation and removal procedures.

15. At the Richford Border Patrol Station, agents conducted records checks on each of the subjects using their fingerprints and the IDENT/IAFIS systems and by querying the names found on their identity documents. None of the subjects had any records in CBP data systems showing valid U.S. immigration status or any applications/petitions for legal U.S. immigration status. In accordance with current DHS policies promulgated under 42 U.S.C. 265 in response to the ongoing COVID-19 pandemic, CASTILLO, PEREZ, PINZON, and ROBLERO were expelled to Canada at approximately 1:00 am on September 26, 2021, rather than being presented for criminal prosecution or civil immigration proceedings.

16. At approximately 1:35 am on September 26, 2021, I attempted to interview CHUMIL. I advised him of his rights using CBP Form I-214, as witnessed by BPA Shelby Theriot. CHUMIL refused to sign the form, which would indicate he understood his rights, and he refused to answer questions without a lawyer present. I asked CHUMIL for his consent to review the contents of his phone, and CHUMIL also refused to grant his consent without a lawyer present. We then ceased all questioning of CHUMIL.

17. At approximately 1:46 am on September 26, 2021, I advised HERNANDEZ of his rights using CBP Form I-214, as witnessed by BPA Theriot. HERNANDEZ signed the form, acknowledging his understanding of his rights and indicating his willingness to waive those rights and answer questions without a lawyer present. I then interviewed HERNANDEZ about his immigration status in the U.S. and his involvement in the events of the previous evening. In sum and substance, HERNANDEZ stated the following:

   a. HERNANDEZ is a citizen of El Salvador. He does not possess any U.S. immigration documents, nor has he ever applied for any such documents.

   b. HERNANDEZ last entered the U.S. on or about March 20, 2004, near Piedras Negras—which I know to be near Eagle Pass, Texas.

   c. HERNANDEZ resides in Washington D.C., where is employed in construction and with a "Taxi Latino" service.

   d. HERNANDEZ described CHUMIL as a friend-of-a-friend whom he does not know very well. HERNANDEZ was offered $200 by a person known to him as "William", a previous customer of the Taxi Latino service, to accompany CHUMIL on this trip to Vermont. HERNANDEZ claimed not to know the purpose of the trip, and he denied knowing they would be transporting illegal aliens. HERNANDEZ was driving when their vehicle was stopped, but both HERNANDEZ and CHUMIL drove during the trip. CHUMIL was navigating the vehicle to a point on a map, HERNANDEZ did not know the ultimate destination.

**Information About Cellular Devices**

18. Based on my training and experience in this and other cross-border criminal investigations, individuals crossing the border illegally will often communicate and coordinate

7

with someone to pick them up once in the United States or to inform them that they successfully crossed the border without apprehension. Many alien-smuggling cases involve an individual acting as a foot guide for a group of aliens, and that foot guide typically communicates with the arranged transporter(s) using cellular devices to call, text, and share location data. Electronic devices typically retain data of sent and received communications, including content of the messages and the numbers of phones with which the devices communicated. Those data would assist investigators in determining the parties involved in a smuggling event and when and how the event was planned. Aliens and foot guides crossing the border illegally often use a cellular telephone's GPS or other mapping functions to search for potential crossing locations and to navigate during crossing events. The devices' applications frequently store location data for long periods, often in manners not readily apparent to the users of the devices. I am also familiar with individuals crossing illegally into the United States using the camera feature of cellular devices to take photos or videos of the location where they crossed or where they are waiting to be picked up; those photos or videos may be informative to investigators on their face, or they may contain location metadata to assist agents in identifying locations used in smuggling events.

19. Individuals involved in alien-smuggling events often include transporters within the United States and within Canada and coordinators in both countries as well. These participants frequently communicate by cellular telephones with each other and with the aliens illegally entering the United States. The participants also often use a cellular telephone's GPS and mapping functions to select and send crossing locations, select and transmit potential pick-up locations, and select and navigate to routes of travel.

20. Based on my training, experience, and research, I know that CHUMIL's PHONE has the following capabilities, among others: wireless cellular connectivity to the Internet and/or

mobile communications network; connectivity with Wi-Fi signals; sending and receiving audio and visual information; digital compass and GPS navigation, location tagging, and tracking; a video camera for still photographs and video recording; a microphone and speaker for audio recording and playback; and a memory unit with a minimum storage capacity of multiple gigabytes. The memory unit on each phone can be used to store user information, voicemails, audio and visual recordings, browsing history, documents, images, and videos. Based on my training and experience, I know that examining data stored on devices of these types can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### Conclusion and Requests

21. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of CHUMIL's PHONE, described in Attachment A, to seek the items described in Attachment B. Specifically, I believe probable cause exists that violations of 8 U.S.C. §§ 1324 and 1325 have occurred and that CHUMIL-Hernandez and HERNANDEZ-Molina were involved in those offenses. Further, I submit that probable cause exists to believe the contents of CHUMIL's PHONE will contain evidence of those offenses.

22. CHUMIL's PHONE is currently in the lawful possession of the United States Border Patrol and has been since September 25, 2021. I seek this warrant to ensure further examination of CHUMIL's PHONE will comply with the Fourth Amendment and other applicable laws. Consistent with Rule 41(e)(2)(B), the requested warrant would permit the examination of CHUMIL's PHONE in a manner that may require authorities to employ techniques including, but not limited to, computer-assisted scans of the entire medium that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

9

23. Because this warrant seeks only permission to examine Subject Electronics already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

Dated at Burlington, in the District of Vermont, this 4 day of October, 2021.

_____
Kevin O'Dowd, Border Patrol Agent (Intel)
United States Border Patrol

Sworn to and subscribed before me this 4th day of October, 2021.

_____
Hon. Kevin J. Doyle, Magistrate Judge
United States District Court
District of Vermont

10